Good morning. May it please the Court. Carney Shigerian appearing before Appellant Salim Iqal. This case brings to this Court a whole group of evidence, different types of evidence, that arise in employment contexts, employment litigation cases. All types of direct evidence, indirect evidence, inferences to be drawn from, evidence starting back in 2001, when Mr. Iqal had already successfully, without question, completed 44 years of employment with United Insurance Company, without a single reprimand, without a single deficient job performance, nothing in the defendant's own words and through their reviews over a time period from 1957 through 2001, but a superior employee working for them. A superior employee who was moved out, had overseen a region for United Insurance during approximately 28 years of his employment and moved out to California, and the last 10 years or so was a manager at an office here in Los Angeles County. At that point in time, the regional manager in this area, towards 2001, started writing my client, who at the time was over 10 years in excess of the next oldest employee in the sales group of about 112 employees, and pressuring him to retire with direct ageist comments that this Court under the Cordova and the Lindhall and a number of series of cases have said is enough to get by summary judgment, is enough to show an intent on behalf of an employee or that there is discrimination as at least a motivating factor for subsequent adverse employment action that may occur, and that in fact occurred to Mr. Eichel within a year and a half after those ageist comments started. There is the McDonnell Douglas standard that's also satisfied in this case. Mr. Eichel was performing his job adequately without question, was replaced by someone approximately 26 his junior, a 51-year-old to 49-year-old individual at the time of his termination. In short, we've presented, and we presented to the District Court, every type of imaginable evidence on a discrimination claim with the exception of a policy and practice of discriminating. That was the only type of evidence I could fathom was not at issue in this case, and the case nevertheless was dismissed. There is the issue of mere pretext, and the defendant's own position throughout litigation was the reason they allegedly fired him for was simply masking another reason that they were going to fire him for anyway over the last six months, that they had already determined they were going to fire him, raising an inference in itself under the Rees versus Sanders employment case whether or not we had here a situation where the employer was telling the truth about the reasons that motivated them ultimately to fire my client. What did your client's cardiologist say? My client's cardiologist submitted, I believe, about two or three reports that were in the record, and about every two months or so he was put on temporary total disability beginning in August of 2002. Didn't he say that he was physically incapable of working after that date? On a temporary basis, correct. Yes. Not totally. In fact, my client went around applying for jobs in a period of time, in this period of time, I believe in 2003. So, no, not permanently disabled at any point in time, and fully functional, and in reviewing for today looking at different reports in the record from Dr. Block's clinic. His doctor who was treating him never said he was able to come back to work, did he? You mean submitted any medical certification? Yes. No, there was never any medical certificate saying you can go back to work. It's time for you to go back to work. The records show, though, that his condition was getting better until Mr. Eichel, in his conversations with the Human Resources Department at United Insurance, was telling them, I'm going to be coming back to work. What do I need to do, essentially? Those aren't the exact words, but that's what the conversation was reflected to Ms. McKinney, and what she reflects in her deposition did occur, in fact. So how do we know he's able to come back to work? At the point in time when he was terminated? Well, before that, I mean, the doctor, I think we were talking about Dr. Block just a minute ago. Correct. So he says he's disabled until, I think, January of 2003, but then in his July report he says he's still disabled. So it's a little bit of a floating situation here where, as far as the employer knows, he's still disabled. How do we know he's not, or what should we look to in your view? Well, I think we should look to Dr. Block's testimony on summary judgment, and he has submitted a declaration indicating that Mr. Eichel would have been able to return to work had they not put him off and sent him into the psychiatric syndrome that he was in at the point in time as of the day they fired him on January 31, 2003. And, of course, that gets us back into this other issue about whether some of the, wasn't his testimony or declaration one of those that was struck because of the contradictory? Right. It was directly, first we got the guy saying he's still disabled. Then now we have a summary judgment motion, and he comes in and says, well, that's not really exactly true. So the judge says, look, you can't really parachute in after the fact and rescue your patient. And that would be understandable, except when you look at the timeline as to what occurred here. What set Mr. Eichel's physical condition off was a psychiatric occurrence where he saw something on the job that upset him greatly. He ended up in Huntington Hospital for the next two and a half days. Over the next weeks and two months or so, his condition got better. He got out of the hospital, was on medication, but he'd always been on medication for the hypertension, I believe, and the heart condition. This was nothing brand new. Give me a clue as to what month or year we're talking about here. I'm talking about the summer of 2002 when he originally goes out. And the original reports when he's going to see the doctors is that he should be able to return to work on October 31, 2002. That's approximately two and a half months after he first goes out in time. He's continuously in contact with the Human Resources Department, my client is, to let them know how his condition is going. And he tells them, I anticipate I'm going to be back at work around the holidays or shortly after the holidays. What do I need to do here? And what sets his psychiatric condition off and his physical condition into a downturn from that is that they put him off, put him off, put him off. They don't give him any direction. They don't say, well, give us a medical certificate. Never asked for it once, never in the record ever, never occurred in this case, unlike the case that. . . It's because then when we have, but then we have the doctor's report who says he's disabled in the summer of 2003, which is nine months after. . . Sure. He hoped to go back to work. He's been fired. He's worked for this job for 46 and a half years at that point in time. I mean, I completely am sympathetic, but the difficulty is sorting out the incongruities in the testimony and the declaration. Well, I don't think it's necessarily incongruous. Well, do you think, I mean, maybe I'm missing something and you can help me out. Normally, of course, if there were inconsistencies between what you said and what the employer said, then there would be no summary judgment. Here, the difficulty we have to unsort or unscramble is the inconsistencies in your own client's statements and the doctor's helping him. So if you have an inconsistency there, the district court said you can't really do that. We're going to have to strike one. And do you disagree with that ruling? Of course. First, let's take the first issue, the inconsistencies between Mr. Eichel's deposition testimony over three days or three different sessions and his declaration testimony. As we set forth in our brief, they're not inconsistent. The one point, the only point that actually there is no even alleged inconsistency between his medical condition alleged. All that they allege is an inconsistency with regards to his communications with United Insurance post-leaving after August of 2002. So that's not really germane to what we're talking about here, but I laid it out very specifically in our brief over about three pages about how he talks about how he spoke with his manager, Joel Smith, on the phone, how he saw him at a funeral after he went on leave. There is no inconsistency at all with regards to his medical condition or his ability to return to work or what he was subsequently doing. But with regards to what I think the court's more interested in here is with regards to the alleged inconsistency between Dr. Block's testimony by declaration and what his medical records show is it's nonexistent. He's describing a person, Dr. Block's a psychiatrist, medical doctor, but a psychiatrist. He's describing a person whose physical conditions got a whole lot worse as a result of the termination and as a result of being put off for the three months, I believe it was, or actually about 11 weeks pre-termination by United Insurance, by his employer of the previous many, many years. In other words, what triggered that condition to get worse and remain permanent for a period of time through the summer of 2003 and actually thereafter until January of 2004 was his termination. Was the psychiatric effects on his termination? Was the door that United Insurance was closing before January of 2003, before they actually terminated him? This is not a situation where my client was even once asked, well, give us any type of medical certificate or documentation. Give us some type of contact to a doctor's office or anything to give us some information about your condition when you'll be ready to return. They just never once asked for any of that information. And, in fact, when he's asking the HR person he's put in contact with, Ms. McKinney, she says, we have to wait until we hear from home office about this. Home office being Pat Stowers, the person who wanted him out and expressed that desire since mid-2001. Well, I'm reading from the district court's now order granting defendant's motion for summary judgment dated March 21, 2005. It says, in 2001, Iqbal received and signed United's policy statement regarding disabilities, which stated that if Iqbal needed accommodation, he should direct such a request to his supervisor or the human resources department, preferably in writing. That's Exhibit 206. I'm sure you're familiar with that. Iqbal never requested that United provide any accommodation for his disability. He didn't return to work after the expiration of six months' leave, and his employment automatically terminated. Is there something, is that wrong? No, that's right, and that's fair. And he did exactly what the policy required. He contacted human resources. He contacted human resources, and it's in the record. And if you want me to go through my brief and give you the exact site, but Ms. McKinney tells him. She's the human resources, and she tells him, I have to wait to hear from corporate office, or home office, rather. Home office is the person who's making ageist comments. When did he do that? That was continuously from October of 2000. Here it says in February 2003, he called OLR, human resources, to ask why his termination. No, no, that's way different, Your Honor, and I have the site in my brief. That's undisputed, according to IqbalDep 61 colon 2 dash 62 colon 4. He was told, well, after 26 weeks, you don't come back. I mean, it automatically terminates, and then he started drawing long-term disability benefits. Looking at page 13 of our brief, it's the record. Dr. Angston wrote in her therapy progress notes that Iqbal had received a letter of termination stating he was eligible for long-term disability benefits. Then after his benefits had expired, then he filed a claim with Fair Employment Analysis. That's correct. I'm looking at the record at page 605 to 606, 1611 to 1612. According to Ms. McKinney, quote, Well, he got the statement, said if you need accommodation, put it in writing, preferably to your supervisor or human resources. Iqbal never requested any accommodation for his disability prior to the time he was let go. Is that right? In writing, correct, but no, that's incorrect with regards to his verbal request. Looking at the slide I just gave the court, Ms. McKinney's response to him is, quote, it's up to your manager if they have the position open for an agent, end quote. Well, according to this, it comes from the uncontested facts. Well, that's just inaccurate. That's just inaccurate. And FEA has no requirement that you put your demand for a reasonable accommodation in writing. My client, from the position he was, didn't know that he needed to request a reasonable accommodation for extended leave, something that FEA requires. In other words, he's out of Was he told that in writing, and did he sign the document? No, the point is this. Yes, of course. Of course, but he's on leave. He's on leave. He doesn't need any accommodation then. He doesn't know they're going to just fire him without even sending him a letter at that six-month time period. Number one. Number two, according to the record, he's talking to the human resources office, telling them, I'm going to be coming back to work, and they're telling him just what I just read to the court. It's up to your home office if they have the position open for an agent. That's what they're telling him. In other words, they're putting him off. They're not listening. They're not trying to engage him in any attempt to reasonably accommodate. They know he has a disability. They know they're going to fire him. And what do they do? Nothing. Do they even tell him at that point in time, well, you know, you have to be back by this certain date. This is the date where we're drawing the six-month time period. No. This would be a wholly different case if any of that came up, if my client hadn't engaged human resources with the regularity that he did. This would be a wholly different case on at least the reasonable accommodation claim. That doesn't affect the age claim and the direct evidence of age. It doesn't affect the McDonnell-Douglas test. It doesn't affect the issue of pretext. The defense is saying, hey, listen, we fired you for this reason, but we were going to fire you for this other thing anyway, the other thing that we dreamed up. But this is better, so now we're going to let you go for that. How about the attorney's fees issues before we run out of time? I would submit on the brief on that, Your Honor. Were the attorney's fees determined based on contract, breach of contract? Correct. We had implied contract and expressed contract claim pled. How does 218 have anything to do with it if they were assessed on contract? There's a couple of FSUF cases taken out of context where money was awarded under 218.5. There's no analysis. No court's ever addressed it. It seems to be an issue of first impression. California courts haven't even addressed it squarely ever, so there really is no answer to that. Those claims were dismissed because when we got to the summary judgment stage, there was an express integrated agreement that my client was given after 42 years of employment that he was signed to negate those. So those claims were dismissed, but there is no law directly on point, Your Honor, on that, and I don't have any enlightenment on that issue other than what we've briefed. The contract claims aren't appealed, right? No, they're not, Your Honor. They're not. Unless there's other questions, if I could reserve a half minute, I have even half a minute left. All right. Good. Thank you. Good morning, Your Honors. May it please the Court. I'm Mark Epstein for United Insurance Company of America. I think I would like to address just this one point that counsel has stressed, this conversation with Shirley McKinney, which supposedly took place in October 2002. She was in Human Resources in Chicago, and that shouldn't be confused with other testimony about a conversation with Mr. Oler in Human Resources, who was also in Chicago, which took place in, I guess, February 2003. This conversation that counsel's relying on with Shirley McKinney that he says his client testified took place in October 2002, that was stricken as sham because the import of the conversation that he's testifying about, he says, I'm telling her that I can work. And he had not disclosed that in any interrogatory response, and moreover, he had been sending repeatedly every month notice to United that he was totally disabled. And so it was stricken. And moreover, even if it weren't stricken, one thing to observe is. You say it was stricken, the declaration? The declaration testimony that he said, I spoke with Shirley McKinney and told her that I'm planning to come back after the holidays. I now can work without a problem and I feel better. Okay, well, here he is just a couple months after his heart surgery. All of his doctors are saying that he is psychiatrically disabled. He's orthopedically disabled from back and neck stress from an automobile accident that he'd had before. And he's cardiovascularly disabled because of this heart attack. And so all of the doctors are saying that he's totally disabled. And he himself is saying he's totally disabled, which I'll get to in just a moment. In any event, it was stricken as sham because he never explained how it was that he had given the testimony that he had earlier that made it impossible for this conversation to have taken place. He didn't show that it was a result of a discrepancy, an honest discrepancy, a mistake, or some newly uncovered evidence as required by the Kennedy case, which Justice Trott authored. Thank you for the promotion. Go ahead. Or Judge Trott. Circuit judge. All right. Excuse me. In any event, the other point, though, about the same conversation is that what he's saying, his claim about his conversation with Ms. McKinney is not that he's asking for an accommodation. He's saying that he says, I'm telling her I feel fine. I'm going to come back to work after the holidays. So that is one point when he never asked for an accommodation. In fact, he never asked for an accommodation. And the reason why was because he was totally disabled. And that's the unfortunate fact of this case that really precludes all of his claims. I mean, the man, it's too bad. I mean, he was a good worker. They put in all sorts of accommodations or recommendations and awards that he got. And we don't dispute that. He was a fine worker. But at 76 years of age, he goes to the hospital, has heart surgery, and then is reported totally disabled by reason of his cardiologist, orthopedist, and psychiatrist, major depression, passive suicidal ideation, panic reactions, sleep disturbance and nightmares, social withdrawal, tearfulness, lowered self-esteem, cognitive impairment, fear of driving long distances, chronic neck and back pain, arthritis, atherosclerotic cardiovascular disease, coronary artery disease, and hypertension cerebrovascular disease. Of course, I would never hope that on anybody. But it caused him to be totally disabled and unable to work. And it wouldn't occur to the company to think, well, gee, what can we do to help him work? He's totally disabled. He can't work. At some point in life, people become unable to work. And there's nothing the employer can do. He stayed employed for almost 50 years. But at some point, you can't look to the employer to make it possible for him to work when he can't. And one thing that's never mentioned in any of the briefs that were filed on behalf of Mr. Eichel is this letter that he wrote out in his own handwriting, which we quoted at page 13 of our brief. And he writes, these are the reasons that I am disabled and cannot fulfill my job function. I'm afraid to drive my car 120 to 130 miles per day. This will endanger my life and the life of others. Because of the severe pain and the limitation of movement in my neck and shoulders, the chest pain, the shortness of breath, the dizziness, spell, the hypertension. It all can be found in the record at page 1777. That's his handwriting. But he's telling us, and that's pretty reliable evidence. Not only all of his doctors saying that he's totally disabled. Page 13. What kind of a letter? Was this a letter he wrote to the company? He wrote this all out, I believe, in connection with an application for some benefits. That's the December 10 letter? Yes. It's in the record of 1841 in the order granting the motion. What was it? Was it a letter to the company? No, no, no. It was a letter for, I believe, workers' compensation benefits. In any event, in one other piece of evidence that I think suggests that he was truly, truly, totally disabled was the fact that although counsel said that he applied for jobs in 2003, that's not the case. That was not his testimony. The first time he said he was thinking about applying for a job was with the Lexus dealership, and he said that when his deposition was taken in late 2004. He said he was thinking he would go apply. So all that time he never applied for a job because he must have felt totally disabled. But in any event, this case just presents the question, what's a company to do when there's nothing to do? There's just not a thing to do. He's totally disabled for all those different reasons. And I should say, by the way, Dr. Block, who was a psychiatrist who did write reports saying he was totally disabled but then signed the declaration, the district court did not strike that testimony but just understood it in its context. Dr. Block testified that he had only seen Mr. Eichel twice, and he testified that from a psychiatric point of view he thought he would get better, but he couldn't know for sure because he had no information about the other disabilities, the orthopedic disability and the cardiovascular disability. So Dr. Block was not saying, hey, I think I could ever have cleared him to go to work, and Dr. Block never did. So the fact that he could never work really disposes of all of the claims because even it disposes of the discrimination claims anyway, the age discrimination claim and the disability discrimination claim that's saying both the one, there's two disability discriminations, one, failure to accommodate, and the other one, firing him because he's disabled. The fact is he couldn't work, so there's no motive issue that arises. And then, again, when you look at the age discrimination claim, it is so thin it's to be nonexistent. Really the only thing that he pointed to, well, he actually pointed to four things, but he withdrew three of them. He had said that the things that showed that he was discriminated on the basis of age were that he didn't get invited to a Christmas party, that no one sent him a get-well card, and one other thing that's not coming to mind right now, but he withdrew all those and he ended up relying on one and only one thing, which was that the regional manager, Patrick Stowers, would come to the district once a month and say hello to everybody and he would shake his hand and he said that every single month they had the exact same conversation and he would say, you're getting old, Sam, when are you going to retire? Or you are old, Sam, when are you going to retire? While he was shaking his hand and Sam, what he said every single time would reply the same way, the day I die. And so the next month here comes Pat Stowers, he shakes his hand, you're getting old, Sam, when are you going to retire? And Mr. Eichau says, the day I die. And that is the beginning and end of the evidence that Pat Stowers is somehow age-biased. No more than that. They'd mischaracterize in their briefs every once in a while and try to make it sound a little bit worse, but Mr. Eichau's testimony, we went over it, made sure that that's exactly what was said and that was the end of it. And I could just imagine. What about the attorney's fees? Because you've indicated that, you know, it is a sad case, the company has a charitable view toward him,  We had hoped that part of that, you're asking about the charity part, so that's maybe motivation. We had hoped that that might have been an incentive for Mr. Eichau not to make us spend yet more money on a case that seems to be an unfortunate expenditure. It's been quite expensive, you know, there's a lot of employees and, you know, these statutes. The statute, this is sort of an odd application of the statute. All right. Well, if you take his complaint, which probably we would all agree is not crystal clear as to what matches up with what. Yeah. I'm not sure. It was on the basis of the contract claims. Basically, there was only the contract claims. He sought wages and benefits under an implied contract claim, which he then withdrew. I mean, he withdrew it, I guess, we moved for summary judgment, and in response, he withdrew that claim. And so we sought attorney's fees, and they were allocated just to the services that were performed that related to the contract claim because the attorney's fees were way more than $20,000. Let's go back to the underlying basis for it, though, as to why. Oh, 218.5 says. No, I understand what the statute says, and I understand you saying it's based on this contract, but why is the contract for unpaid wages as the statute laid out? The way the statute reads is if a, I don't have the quote exactly in mind, but essentially it says if you're asking for wages or benefits, and neither party in its initial pleading seeks attorney's fees, then the prevailing party gets its attorney's fees. Right. Before you get to the merits of that, let me go back to Judge McCune's original question. Yes. Now that it didn't work, are you still really pressing to get $20,000? I was pretty shocked, actually. Mr. Eichel actually paid the attorney's fees already, and. He paid them? He paid them, actually. Yes, I was. Because he's an honorable guy. Well, maybe. Would you like to go back, then? If I could report to the court, I'd have to get my client's authority, but I don't think they're really excited to get money from Mr. Eichel. I wouldn't think so. I don't think so. So I think that's a possibility. Shall I send a letter to the court? If you decide that you don't want to do that, you can let us know. Yeah. You know. In other words, if that's not, if that dropped out of the appeal, we wouldn't have to address it, in other words. Okay. I mean, I know the people that I deal with, they don't want Mr. Eichel's money, so I imagine I would be able to get such authority. And also, it's an interesting legal question, but I must say I think as far as I'm concerned, your chances of prevailing on that are not very good. Ah, well, maybe that would be a greater incentive to them to agree to give it to us. But, you know, I just, you know, it's just these statutes, you know, it's a very important statute, just, you know, the disability statutes that say that employers need to accommodate disabled employees. I mean, it's really, really, I think, serves a great public purpose. But it's a really unfortunate thing when you've got employers who get sued when there isn't a good claim, and they end up spending huge amounts of money, and they really can't recover their attorney's fees back from relatively impecunious employees. So it puts a lot of pressure on the employers to be hammering on the legislature, don't enact these statutes. And so, you know, it's... Of course, no, well, the only thing I'll end with is nobody makes you actually have to file the motion for fees. In other words, that's a voluntary act on behalf of whoever... Yes. But I recognize having... Well, actually, I should say, we actually sought additional attorney's fees under the, you know, the discretionary fees. And what happened is the district court signed an order. The very day that he entered judgment, he said the parties are to bear his own fees. So we filed a motion to reconsider that, saying, you know, we filed our motion within 14 days. And the district court said, well, it says, or such earlier date as the court may decide, may order. And I've already ordered. You have no days. We decided to abandon that appeal just because, for the same reason that I think the court is asking us, do we really want to keep them. All right. Thank you, Kev. Very briefly, if I may respond. With regards to this last issue, the company wasn't quite as benevolent as it would like to portray itself. They served a debtors' exam on Mr. Eichel to collect those fees. And those fees and the costs... Are you trying to snatch defeat from the jaws of victory here? Well, I paid for the attorney's fees and I paid for the costs. And I'm not really that concerned with receiving that money back. You're not? I'm not. Wait, wait, wait. You paid for the fees. Are you permitted to do that under the California ethics rules, to pay the client's fees? I paid for the attorney's fees. I paid for the costs. To stop the debtors' exam from going forward, predominantly, that United Insurance had approved in order to occur, number one. Number two, with regards to the more substantive issue... Do you want to quit while you're ahead on it? Yeah, let's talk about the merits. Sure. The merits of the discrimination claims. The point is this. When an employer knows of an existing disability, and if they're going to take the position that they thought this was a total disability permanent, they're not using the word permanent. All they're saying is totally disabled. In the workers' comp setting that has a particular meeting, it doesn't mean that you cannot work in a job with an accommodation. As Justice O'Connor wrote seven years ago in the Cleveland decision, what's disabled under the Social Security Benefits Act versus the ADA versus other systems is totally different and needs to be clarified in particular circumstances. In the case before this court, there is no evidence from the defense that they put forward that with an extended leave, if Mr. Arkell even needed that beyond the six-month period, he could not have returned to his work gainfully. This is a gentleman, the medical records show, and you have them all in front of you, who had a history of different health ailments, of different disabilities, for lack of a better phrase, and had worked through them fine. Taken very brief leaves in the past, this one was more extenuated, but he had worked through them fine up until a rather advanced age. Was any of them cardiologist-related? Yes, going back to 1997 or 1996. But yes, he had problems with regards to his circulatory and his heart, going back at least four years, five years before this time period. So this was nothing brand new to the system. This was nothing brand new to what the defendants knew, because he also had had a car accident, I believe, in 2001 with some minor residual problems. His job did require driving at different points in time when he was working for the company. But it was important for United Insurance, under the Fair Employment Housing Act, to at least in good faith engage in the interactive process. And it's very hard to fathom that they had any interest in doing that, considering, as the record shows, they planned on firing him for something else totally anyway, according to what their own testimony is. They claimed they were going to fire him over an error that a temporary subordinate made, or maybe it might have been an intentional act, that's unclear on the record, what Mr. Avakian had done. They were going to fire him over that anyhow. They've claimed that since day one in discovery in this case. And I think that lends itself to rationale why they weren't really caring if they followed these field laws with regards to Mr. Aikala and didn't really care to bring him back, because they wanted him gone anyway. That's a very important fact, I think, for the Reeves analysis when you look for pretext. The reason they say they're firing him was something totally different that admittedly was in their mind going back to August of 2002. They said they were going to fire him for some other reason regardless. And I think when you have that dispute in itself going forward in an employment case where it's very hard to prove, necessarily very hard to prove what's the motivating factor, what's the intent behind what an employer is doing, that shouldn't be enough to get you by summary judgment in these very, very difficult cases to prove. The fact that these comments were being said, defense counsel may characterize it and reenact it as a friendly exchange, a slap on the back. Mr. Aikala was very particular at his deposition and by declaration that these were not friendly exchanges. They were not, oh, you're getting old, I'm getting old, let's laugh about that. They were pointed to him. To him it was harassing, he used the word harassing at his deposition, because this is who he was at that point in time. Yes, he was by far and away the oldest person in his office, but he was still productive, he was still able to do his job. And that's something that they were able to dispute on summary judgment with any competent evidence, that he was doing his job and fine to do his job, and that these comments and that all the other different standards that have evolved from the McDonnell-Douglas test down the line were proved. We don't have to, on summary judgment, say that the evidence is undisputed in our favor, but all the evidence was looked at in the light most unfavorable to Mr. Aikala by the district court, respectfully. And that just is extremely unfair in these cases. None of these cases, none of my best cases will ever make it to trial if you look at the evidence like that. If a district judge is allowed to do that, they'll all be dismissed, because you'll find some negative thing. Well, this person came late to work six months ago. This person did that. Okay, that's a good reason. Have a good day. Thank you, counsel. Thank you. The case just argued will be submitted. The final case of the morning is Ferguson v. Oh, the case, no, sorry. We'll defer submission for 10 days until we hear from counsel on the fees issue. And then we'll enter a further order. Thank you, counsel. It's confusing now because it will never pay. Well. Okay. Oh. Ferguson versus Gonzalez.
judges: Reinhardt, Trott, McKeown